[Cite as *State v. Akers*, 2021-Ohio-2562.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J.<br>Hon. Earle E. Wise, Jr., J. |
| -vs- | |
| | Case No. 20 CAC 08 0033 |
| JEFFREY AKERS | |
| Defendant-Appellant | O P I N IO N |

CHARACTER OF PROCEEDINGS:      Appeal from the Delaware County
                               Municipal Court, Case No. 20CRB00192

JUDGMENT:                      Reversed and Remanded

DATE OF JUDGMENT ENTRY:        July 26, 2021

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

AMELIA BEAN-DEFLUMER                  TYLER W. DUNHAM
Delaware City Prosecutor              98 N. Union Street
70 North Union Street                 Delaware, Ohio 43015
Delaware, Ohio 43015

*Hoffman, P.J.*

{¶1}    Defendant-appellant Jeffrey Akers appeals the judgment entered by the Delaware Municipal Court convicting him of domestic violence (R.C. 2919.25), assault (R.C. 2903.13) and disorderly conduct (R.C. 2917.11) and sentencing him to 180 days incarceration with 150 days suspended.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}    On January 24, 2020, Delaware police dispatch received a 911 call from an unknown caller.  The caller did not speak, and the only audio noted by dispatch was "heavy breathing."  When dispatch received no response after trying to redial the number, officers were dispatched to the location of the call.

{¶3}    Officer Dylan Griffin was dispatched to the area of 783 Liberty Road, Delaware, to investigate.  Although unsure exactly how much time had passed between the time he received the call and his arrival at the residence, he speculated it could have been as long as forty-five minutes, although probably not a full hour.  Tr. 94.  He knocked on the door of 783 Liberty Road, and no one answered.  He knocked on the door of the apartment next door, and the occupants advised him no one from the apartment had dialed 911.

{¶4}    Officer Griffin returned to 783 Liberty Road to further investigate.  Officer Chris Bates arrived on the scene.  The front door to 783 Liberty Road was locked, but lights were on inside.  Through vertical blinds at the back door, the officers observed a highchair tipped over and food thrown around the kitchen.  It appeared to the officers a struggle had taken place in the apartment.

**{¶5}** The officers found the back door unlocked, and so they entered and announced their presence. The officers searched the first floor and found no one present. The victim emerged at the top of the stairs to the second floor, clutching her young child. The victim was crying, her upper lip was bleeding, and her lips were swollen. She asked the officers, "Is he still here?" Tr. 78. The victim did not identify the person she was referring to as "he."

**{¶6}** The victim came downstairs to speak with police. Throughout the interview, she was crying and complained of pain, but was conscious, alert, able to think things through, and her statements to police made sense to them. Before the police arrived, the victim had called Appellant's mother, and during the interview Appellant's father arrived at the home looking for him. The victim would not identify Appellant by name, but indicated she got into an argument with the man she was living with and he banged her head against the wall. She told police her assailant was the father of the child, but when asked specifically by Officer Griffin if Appellant was the person who hit her, the victim did not answer, and only stared at the officer. Police were able to ascertain Appellant's identity through the name of the child and through Appellant's father when he arrived at the apartment.

**{¶7}** Appellant was charged with domestic violence, assault, and disorderly conduct. The case proceeded to jury trial in the Delaware Municipal Court. The victim did not testify at trial. However, her statements concerning the events of January 24, 2020, were admitted through the testimony of Officers Griffin and Bates. Appellant objected at the time of such testimony on the basis of hearsay. The trial court overruled his objections, finding the statements the victim made to the officers admissible as an

excited utterance pursuant to Evid. R. 803(2). At the close of evidence, Appellant objected to the admission of the victim's statements to police on the basis of hearsay and the Confrontation Clause of the Sixth Amendment to the United States Constitution. The trial court noted Appellant did not object based on Confrontation Clause during trial, but nonetheless allowed Appellant to make the objection. The trial court overruled Appellant's Confrontation Clause objection on the basis the officers were responding to an ongoing emergency.

{¶8} Following trial, the jury found Appellant guilty of domestic violence and assault, and the court found Appellant guilty of disorderly conduct, a minor misdemeanor. The trial court sentenced Appellant to 180 days in the Delaware County Jail with 150 days suspended. It is from the August 25, 2020 judgment of the Delaware Municipal Court Appellant prosecutes his appeal, assigning as error:

I. THE TRIAL COURT ERRED TO THE DEFENDANT'S PREJUDICE BY ALLOWING IMPERMISSIBLE HEARSAY TO BE ADMITTED AT TRIAL BY MISAPPLYING THE EXCITED UTTERANCE EXCEPTION, IN VIOLATION OF THE OHIO RULES OF EVIDENCE.

II. THE TRIAL COURT ERRED BY REPEATEDLY ALLOWING THE INVESTIGATING OFFICERS TO ADMIT TESTIMONIAL HEARSAY STATEMENTS OF THE ALLEGED VICTIM, WHO WAS NOT PRESENT AT TRIAL, IN VIOLATION OF THE RIGHT OF CONFRONTATION CONTAINED IN THE SIXTH AMENDMENT OF THE UNITED STATES

CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

I.

**{¶9}** In his first assignment of error, Appellant argues the trial court erred in admitting the statements the victim made to Officers Griffin and Bates under the excited utterance exception to the hearsay rule.

**{¶10}** "A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). An abuse of discretion is more than a mere error in judgment; it is a "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

**{¶11}** Evid. R. 803(2) provides an excited utterance is not excluded pursuant to the hearsay rule, and defines "excited utterance" as, "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  A statement which is otherwise considered hearsay may be admissible as an excited utterance when the following four criteria are met: "(1) a startling event, (2) a statement relating to that event, (3) a statement made by a declarant with firsthand knowledge, and (4) a statement made while the declarant was under the stress of the excitement caused by the event." *State v. Dean,* 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 123.

**{¶12}** Appellant argues the victim's question, "Is he still here?", as well as the remainder of her statements to the police, are hearsay statements which do not qualify as an excited utterance. Hearsay is defined by Evid. R. 801 as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The victim's question as to whether "he" is still here is not a statement offered to prove the truth of the matter asserted, and therefore is not hearsay.

**{¶13}** As to the remainder of the statements the victim made to the police concerning Appellant's actions on the day in question, we find the trial court did not err in finding the statements admissible under the excited utterance exception. Appellant argues the trial court erred by not inquiring as to whether the victim's "reflective faculties" had been compromised, citing *State v. Duncan,* 53 Ohio St. 2d 215, 373 N.E.2d 1234 (1978). In *Duncan*, the Ohio Supreme Court set forth the four-part test for an excited utterance as follows:

> Testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declarations spontaneous and unreflective, (b) that the statement or declaration, even if

not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

**{¶14}** *Id.* at syllabus 1.

**{¶15}** While *Duncan* has not been expressly overruled, we note the Ohio Supreme Court has replaced the language of the *Duncan* test with the simplified language set forth in *Dean, supra.*

**{¶16}** We find the trial court did not abuse its discretion in finding the victim's statements were made while she was still under the stress of the startling event in the instant case. The officers described her as frightened, crying, shaking, and nervous. She had visible injuries to her face, and her nervous behavior continued throughout her interaction with police. We find the trial court did not abuse its discretion in admitting the statements made by the victim under the excited utterance exception to the hearsay rule.

**{¶17}** The first assignment of error is overruled.

II.

**{¶18}** In his second assignment of error, Appellant argues the admission of the victim's statements made in the police interview violated his rights under the

Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

{¶19} In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court concluded the Sixth Amendment prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id*. at 54. Applying that definition to the facts in *Crawford*, the court held statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. *Id*.

{¶20} In *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which the U.S. Supreme Court decided together, the court concluded statements are not testimonial if the primary purpose of the interrogation by law enforcement was to enable police to respond to an ongoing emergency. Statements are testimonial when the circumstances objectively indicate there is no such ongoing emergency, and the primary purpose of the interrogation is to establish past events which are potentially relevant to later criminal prosecution. *Id*. at 822.

{¶21} The Supreme Court further expounded on the primary purpose test in *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). In *Bryant*, shortly before dying from his gunshot wounds, the victim made statements to police concerning the shooting and identifying the shooter. Police encountered the victim laying on the ground of a gas station parking lot. The armed shooter remained at large. In finding the victim's statements to the police to be non-testimonial, the court explained the existence of an "ongoing emergency" at the time of the encounter is among the most

important circumstances informing the interrogation's "primary purpose." *Id.* at 361. Whether an emergency exists and is ongoing is a highly context-dependent inquiry. *Id.* at 363. An assessment of whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat to the first victim has been neutralized because the threat to the first responders and public may continue. *Id.* An emergency's duration and scope may depend in part on the type of weapon involved. *Id.* at 364.

**{¶22}** A victim's medical condition is also important to the primary purpose inquiry to the extent it sheds light on the victim's ability to have any purpose at all in responding to police questions and on the likelihood any such purpose would be testimonial. *Id.* at 364–365. The victim's condition also provides an important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public. *Id.* at 365. An emergency does not necessarily last the entire time a perpetrator is on the loose, but trial courts can determine in the first instance when an interrogation transitions from non-testimonial to testimonial. *Id.*

**{¶23}** Finally, another factor to consider pursuant to the "primary purpose" test is the encounter's informality. *Id.* at 366. Formality suggests the absence of an emergency, but informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. *Id.* However, the court distinguished the facts in *Bryant*, where the questioning occurred in an exposed public area, before emergency medical services arrived, and in a disorganized fashion, from the formal station-house interrogation in *Crawford. Id.* In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence

of the primary purpose of the interrogation. *Id.* at 367. Police officers in our society function as both first responders and criminal investigators and their dual responsibilities may mean they act with different motives simultaneously or in quick succession. *Id.* at 368. Similarly, victims are also likely to have mixed motives when making statements to the police. *Id.* During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, which does not necessarily mean the victim wants or envisions prosecution of the assailant. *Id.* A victim may want the attacker to be incapacitated temporarily or rehabilitated. *Id.* Alternatively, a severely injured victim may have no purpose at all in answering questions posed, and may provide answers which are simply reflexive. *Id.* at 368-69. The victim's injuries might be so debilitating as to prevent her from thinking sufficiently clearly to understand the purpose of her statements to police. *Id.*

{¶24} We find the facts of the instant case distinguishable from *Bryant*. The victim in the instant case was not questioned while lying injured in a public parking lot, but was in her own apartment, which had been searched by police. While Appellant's whereabouts were unknown, there was no apparent concern he had a weapon such as a gun which would present a potential danger to the public and to first responders on the scene. Although the victim displayed visible injuries, she was not so debilitated as to cause her answers to be simply reflexive in nature. Police testified she was conscious, alert, and able to think things through, and her statements to the officers made sense. Further, the circumstances of the interview reflect the police had moved from their purpose as first responders in this case – locating the victim, evaluating her injuries, and securing the scene – to their purpose of criminal investigation before the interview began.

Although the interview did not have the same formality as a police station interview, Officer Griffin testified the victim would not name Appellant as the assailant even when specifically asked if Appellant was the person who hit her. He testified on redirect the victim did not want to get Appellant in trouble, and did not want to participate in the investigation. This testimony indicates the victim believed the interview was investigatory in nature at this point.

**{¶25}** The State relies on this Court's decision in *State v. Brown*, 5th Dist. Stark No. 2018CA00120, 2019-Ohio-3486, in which we found an ongoing emergency existed in a domestic violence situation. In *Brown,* the victim called 911 to report she was assaulted by the defendant, her live-in boyfriend. Canton police were on the scene within three minutes. Officers found the victim sitting on the front steps of a multi-unit building, holding a towel to her eye. An officer testified he could see the "substantial" injury to the victim's eye as he exited his cruiser, twenty feet away from where she was sitting. She told officers she had been living with the defendant since she was released from jail a short time before. On this night, the defendant became angry and struck her once in the face with a closed fist, knocking her to the ground. Officers observed blood running down the victim's face and requested medics to the scene because she was obviously seriously injured. A paramedic who responded testified the victim had traumatic physical injuries to her face which required immediate medical attention. The left side of her face was severely bruised and swollen. Her left eye was swollen almost completely shut, and the eyeball itself was injured and bleeding. She had a 1-centimeter laceration to her eyebrow. Her nose and jaw were also swollen and her left pupil was dilated. The victim had an "alert & oriented" score of three, indicating she was somewhat dazed.

**{¶26}** The victim spoke to police at the scene and provided the defendant's name and the number of the apartment he was in. Officers knocked on the door but no one answered. The victim told them that if the door was locked, he was definitely inside. Officers also noted they were on the scene within three minutes and had every reason to believe the defendant was still inside. Officers forced entry into the apartment and found the defendant lying in bed with no one else present. Police awakened the defendant, Mirandized and arrested him.

**{¶27}** In finding the statements the victim made to police to be non-testimonial in nature due to an ongoing emergency, this Court held:

> In this case, we find Doe's statements to police were nontestimonial under the primary purpose test. When Ptl. Jones arrived at the apartment building, his primary purpose was to determine how to address an ongoing emergency from his standpoint as a first responder. See *Bryant*, supra, at 1160. Jones sought information from Doe to obtain appropriate medical assistance for her injuries, to determine whether the threat of immediate danger had subsided, and to identify and locate the assailant. See, *State v. Little*, 3rd Dist. No. 1-16-29, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 21. Further, this interview was informal, taking place at the location where Jones first encountered Doe and indicating Jones perceived this situation as an ongoing emergency. *Little*, id.; see also, *State v. Knecht*, 12th Dist. Warren No. CA2015–04–037, 2015-Ohio-4316, ¶ 25.

The ongoing emergency continued because police did not know if appellant was present in the apartment or if the area was secure. *Id.*, citing *Cleveland v. Williams*, 8th Dist. Cuyahoga No. 101588, 2015-Ohio-1739, 2015 WL 2165564; *State v. Sanchez*, 8th Dist. Nos. 93569 and 93570, 2010-Ohio-6153, 2010 WL 5235932.

Doe's statements were made "with the primary purpose of enabling the police to 'meet an ongoing emergency,' i.e., to apprehend the person involved." *Colon* at ¶ 23. Doe was also injured and in need of medical attention. Upon our review of the circumstances from Doe's perspective, "we find it unlikely that she or any reasonable person in this situation would perceive this interaction with law enforcement as being primarily a means for police to collect statements for later use at trial." *Little*, supra, 2016-Ohio-8398 at ¶ 22.

We find that Doe's statements to police arose during an informal interview to procure the basic information police needed to proceed responsibly. *Id.* Jones obtained the statements to serve as the basis for further, responsive police action; the statements were not obtained for the primary purpose of documenting past events for later prosecution. *Id.*, citing *Colon* at ¶ 20 and *Merritt* at ¶ 13.

**{¶28}** *Brown, supra*, at ¶¶ 45-48.

**{¶29}** We find the instant case distinguishable from *Brown* in several key ways. In *Brown*, the victim was severely injured, in need of immediate medical attention, and

somewhat dazed. In the instant case, the victim's injuries were visible but not debilitating. Further, while the officers found the victim in this case to be distraught, they did not describe her as "dazed." Officer Griffin testified she was alert and able to think things through, she did not want to get Appellant in trouble, and she did not want to participate in the investigation. While the officers in *Brown* encountered the victim outside and received the information concerning the defendant's whereabouts inside the apartment building before they had secured the scene, in the instant case, the victim's statements to police did not occur until after they had searched the apartment to determine who was present. The Appellant was not in the apartment. In *Brown*, the police arrived on the scene in three minutes, whereas in the case *sub judice*, possibly as long as forty-five minutes elapsed from the 911 call until police arrived on the scene. In contrast to *Brown*, the victim's statements to police concerning the events of the evening did not provide information police needed to proceed responsibly; police had already searched the apartment, and the threat posed by Appellant had ended prior to the statements made by the victim. The victim's reluctance to name Appellant in the instant case, even when specifically asked if Appellant was the assailant, is further indication she saw the nature and purpose of the interview as investigative in nature. We find the statements obtained by the police in the instant case were obtained for the primary purpose of documenting past events for later prosecution, rather than to respond to an ongoing emergency, and the admission of the statements violated Appellant's rights under the Confrontation Clause.

{¶30} The second assignment of error is sustained.

{¶31} The judgment of the Delaware County Municipal Court is reversed.  This case is remanded to that court for further proceedings according to law, consistent with this opinion.


By: Hoffman, P.J.

Wise, Earle, J., concurs and

Delaney, J., dissents in part; concurs in part

*Delaney, J., concurring in part and dissenting in part,*

{¶32} Upon review of the trial transcript, I would find any statements by the victim to be non-testimonial. The totality of circumstances indicate the roles of Officers Griffin and Bates were as first responders when they questioned and elicited responses from the victim in this case. The interview was commenced within minutes of the on-scene arrival of the officers to a domestic violence situation and the injured victim was questioned informally (while holding her infant), in her disarrayed home, and the whereabouts of the perpetrator unknown. They observed visible injuries (bleeding lip and swollen jaw) and described her demeanor as fearful, crying, and nervous. The police officers needed to determine if she needed medical attention, who the assailant was, his whereabouts, and if he was still an active threat to the victim, the officers, or the public. As the majority correctly ruled, the standard for admitting her statements as excited utterances was established by the prosecution. The statements were sufficiently reliable under a well-established hearsay exception. Furthermore, there does not appear to be any indicia of solemnity to qualify them as testimonial. In responding to a domestic violence situation, the police need to make initial inquiries to determine who and what they are dealing with to protect the victim, themselves and the public. Objectively, the officers' role as first responders could still be seen as their primary function. The primary purpose was not to create an out-of-court substitute for testimony. I would therefore conclude the testimony was not presented in violation of the Confrontation Clause.

**{¶33}**  For those reasons, I respectfully concur, in part, and dissent, in part.

**{¶34}**  I would overrule both assignments of errors and affirm the judgment of the  trial court.